UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ROSEMARY S. KELLEY | ) | |
| of Friendship, County of Lincoln, | ) | |
| State of Maine. | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | CIVIL ACTION |
| v. | ) | Docket No. 1:12-cv-00390-NT |
| | ) | |
| MARY MAYHEW, and | ) | |
| STATE OF MAINE, Department of | ) | |
| Health and Human Services | ) | |
| | ) | |
| **Defendants** | ) | |

PLAINTIFF ROSEMARY S. KELLEY'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
WITH  INCORPORATED MEMORANDUM OF LAW

Plaintiff Kelley requests the Court to Deny Defendant's 12(b)(1) and (6) motion to

dismiss her complaint and states as follows.

Factual Allegations

Since childhood Plaintiff Rosemary Kelley has been hard of hearing and worn hearing

aids. (Complaint ¶6) Kelley was employed by Sonshine Nursery School for 31 years as a

teacher's assistant. (Complaint ¶9 and ¶10 ) On September 17, 2010 Brian McAuliffe, an

employee of the State of Maine's Division of Licensing and Regulatory Services, visited Sonshine

Nursery School to conduct a survey following Sonshine Nursery School's application for renewal

of its license. (Complaint ¶11) During McAuliffe's visit he observed the staff at work and became concerned about Kelley's ability as a result of her hearing loss to effectively supervise the children. (Complaint ¶12)   McAuliffe had no training or expertise in hearing loss and did not request a report from Kelley's audiologist. (Complaint ¶14)  Kelley noticed herself being observed and asked McAuliffe if there was anything wrong.  He said there was no problem. (Complaint ¶16)  McAuliffe determined that Kelley could not be counted in the staff to child ratio and that licensing action would need to be taken on the license, due to the facility not meeting proper staff-child ratios. (Complaint ¶22 and ¶24)  On November 20, 2011 Kelley was told by Sonshine Nursery School that she would be terminated on December 23, 2011. (Complaint ¶25)  This was the first time she learned that she could not be counted in the staff to child ratio. (Complaint ¶18)  Kelley contacted the Division of Licensing and Regulatory Services and told them she needed new hearing aids, but they offered no options or advice to her that would allow her to continue working with children. (Complaint ¶28)

I  The Claims Against Mayhew in Her Official Capacity are Not Duplicative of the Claims Against the Department  Because Plaintiff Has Requested Injunctive Relief

Kelley in her Prayer for Relief in fact requested injunctive relief. Item B requests the court, "To order the Defendant to promulgate written policies and procedures to ensure that Defendant carries out licensing of child care facilities in a nondiscriminatory manner."  It was directed at Defendant Mayhew and was meant to correct an ongoing violation of federal law – lack of due process for employees who are not counted in the staff to child ratio. Unfortunately the exact term "injunctive relief" was not used.

II  Kelley's Claims Against the Department and Mayhew under the Americans with Disabilities Act are not Barred by the Eleventh Amendment.

 In *Tennessee v Lane*  541 U.S. 509 (2004), the Supreme Court reviewed case law and explained that Congress may abrogate a State's Eleventh Amendment immunity if "Congress unequivocally expressed its intent to abrogate that immunity" and if "Congress acted pursuant to a valid grant of constitutional authority." The Supreme Court noted that the ADA clearly stated the intent to abrogate the immunity, so the only question remaining in Eleventh Amendment challenges to ADA cases was whether Congress had the constitutional authority to do so.

The Supreme Court stated that Congress can abrogate a State's sovereign immunity when it does so pursuant to a valid exercise of its power under §5 of the Fourteenth Amendment to enforce the substantive guarantees of that Amendment.  The Court explained that §5 legislation is valid if it exhibits "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."

Whether Congress's enactment of Title II of the ADA satisfies the "congruence and proportionality " requires a three step process.  The first step is to identify the constitutional right or rights that Congress sought to enforce when it enacted Title II. The Supreme Court answered this question by stating that Title II of the ADA sought to not only enforce irrational disability discrimination, but also seeks to enforce a variety of other basic constitutional guarantees such as rights that are protected by the Due Process Clause of the Fourteenth

3

Amendment. (The Court in *Lane* noted that the Due Process Clause afforded "a meaningful opportunity to be heard.")

The second step was to determine whether Congress "identified a history and pattern of unconstitutional discrimination by the States against the disabled." The Court found that Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights. For example, as of 1979, most State categorically disqualified "idiots' from voting, without regard to individual capacity.

The third step was to determine whether Title II is an appropriate response to this history and pattern of unequal treatment. The Court admitted that Title II reaches a wide array of official conduct from voting-booth access to seating at state-owned hockey rinks, bringing into question whether Title II is appropriately tailored to serve its objectives. However, the Court found that "nothing in our case law requires us to consider Title II with its wide variety of applications, as an undifferentiated whole."  The Court found that each case should be analyzed separately. In Lane, the Court held "Because we find that Title II unquestionably is valid §5 legislation as it applies to the class of cases implicating the accessibility of judicial services, we need go no further."

In this case Maine's Division of Regulatory Services, based on her disability, conferred on Kelley  an unfavorable status.  The unfavorable status was that she could not be counted in the staff to child ratio at the nursery school where she had worked for 31 years.  This status cost her her job.  Not only was she not told that this unfavorable status had been conferred on her,

once she learned of it she was left with no way to appeal the status due to the fact that she was not the licensee.

Kelley's right was fundamental. She was deprived of her Fourteenth Amendment Due Process Rights.  (Under the first section of the Fourteenth Amendment no State shall "deprive any person of life, liberty, or property, without due process of law.") While not physically blocked from entering a court house as the plaintiffs in *Lane*, the regulations, policies and practices of Maine's Division of Regulatory Services resulted in her losing her job and left her without any opportunity to be heard.

**III.  Kelley Alleged Sufficient Facts to Establish Claims Against Mayhew and the Department under the Maine Human Rights Act, The ADA and Section 504 of the Rehabilitation Act**

**A. The Reach of §4592 1.E of the Maine Human Rights Act, Title II of the ADA and 504 of the Rehabilitation Act is Wide and the Defendants were Obligated to Provide Reasonable Accommodation to Kelley**

The Defendants incorrectly argue that Kelley's Maine Human Rights Act, ADA and §504 rights were not violated because she was not excluded from participation in a program or activity of a public entity. This argument is based on an extremely narrow reading of §12131 of Title II of the ADA and §4592 1 E. of the Maine Human Rights Act.  These statues provide "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities by a public entity, *or **be subject to discrimination by any such entity.**"*

The ADA does not define "programs, services or activities." However, the

Rehabilitation Act provides that ***"'program or activity' means all of the operations of…a***

***department, agency…or other instrumentality of a State or of a local government."*** 29 U.S.C

§794(b).

The Defendant's argument also ignores the part of §12131 that states, "no qualified

individual with disability ..***be subject to discriminate by any such entity***." Additionally, although

the definition of "discrimination", which includes not making reasonable accommodations for

an otherwise qualified individual with a disability, appears in Title 1 of the ADA, it is equally

applicable to claims under Title II. *Cave v East Meadow Union Free School District* 480 F.Supp.2d

610 (2007)

Putting the above definitions together, under the Maine Human Rights Act, the ADA

and §504, all the operations of a public entity must make reasonable accommodations for

individuals with disabilities.  This means that the State has a duty to accommodate not only

those who it licenses but also those with whom it comes into meaningful contact during the

licensing process.

The ADA Technical Assistance Manual of the EEOC and the Department of Justice

provides an example of a state violating the ADA in its licensing process.

ILLUSTRATION: A State prohibits the licensing of transportation companies that employ

individuals with missing limbs as drivers. XYZ company refuses to hire an individual with a

missing limb who is "qualified" to perform the essential functions of the job, because he is able

to drive safely with hand controls.  The State's licensing requirements violate Title II.   (II-3.7200

Licensing)

**B. The Defendants' Decision that Kelley Could Not be Counted in the Staff to Child Ratio Does Amount to an Adverse Action Against Kelley.**

The definition of discrimination in §12112 of the ADA includes small acts such as "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee." The decision by the Department that Kelley could not be counted in the staff to child ratio does amount to adverse action against Kelley due to the fact that it diminished her value to her employer and her dismissal was foreseeable.

Although the dismissal of Kelley by her employer was foreseeable and resulted in significant financial loss and emotional distress to Kelley, the Department's decision that Kelley could not be counted in the staff to child ratio went beyond her relationship with her former employer. For example, her status would follow her if she applied for a job at another nursery school. An honest applicant would feel compelled to explain to a potential employer that the State said she could not count in the staff to child ratio. In short, the decision diminished her value in the work force and continues to haunt her to this day.

The defendants urge that it was Sonshine that allegedly took adverse action against Kelley and suggest that her dispute is with Sonshine. This argument ignores the fact that Sonshine could employ the business defense as set out in 42 U.S.C. §12113. (See *Murphy v United Parcel Service*, 946 F. Supp. 872, 883 (1968) Murphy was hired by UPS as a mechanic. Due to high blood pressure , Murphy could not get a Department of Transportation Health Card. UPS fired Murphy and the  court held that compliance with DOT regulations is a complete

defense to Murphy's ADA claim."The ADA does not require an employer to accommodate a person's disability by ignoring other duties imposed by law.")

If Kelley was only allowed to seek accommodations from her employer, Kelley would be dependent on her employer to go to bat for her against the State. An employer could offer an accommodation to an employee, but it would be the State that would have to determine that the accommodation remedy a deficiency in the State's eyes.

**C. Kelley requested an accommodation from the Defendants.**

The Defendants argue that Kelley failed to request an accommodation. First, Kelley would have requested an accommodation during the licensing process if she was aware that she needed one. Once she learned that she was not included in the staff to child ratio she called the state to find a solution, but no suggestions or help was offered. She explained to the defendants that she needed new hearing aids. (¶27) This was clearly a request for an accommodation.

**D. Kelly Has Alleged Sufficient Facts That She Was A Qualified Individual With A Disability for the Purposes of Her Discrimination Claim**

Kelley has alleged in her complaint that she is a qualified individual with a disability.(¶8)  She also alleges in the complaint that she was employed in the position for 31 years( ¶9) and alleges that at all times during those 31 years she wore hearing aids (¶6).

Defendants argue in their Motion to Dismiss on the Pleadings that Kelley is not a qualified individual with a disability because they say so. Defendants also argue that Kelley is a

"direct threat to the health and safety of others."However the determination that a person poses a direct threat to the health and safety of others may not be bases on generalizations or stereotypes about the effects of a particular disability.  It must be based on an individualized assessment, based on reasonable judgment that relies on current medical evidence or on the best available objective evidence, to determine the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk.  See 28 CFR §36.208(b). Kelley alleges in her complaint that the State's individualized assessment was inadequate.  She alleges that McAuliffe had no training or expertise in hearing loss (¶ 12), did not request or review Plaintiff Kelley's audiograms , ask for a report from her audiologist ¶ 14)or speak to her about his concerns (¶¶  15 and 16)

### E  Kelley has Alleged Sufficient Facts to Establish that the Defendant's Acted Intentionally or with Deliberate Indifference.

Kelley alleged in her complaint that the Defendants intentionally or with deliberate indifference discriminated against her. (¶¶41 and 47)  The complaint in fact alleges acts and omissions that were "intentional."  For example Kelley specifically asked McAuliffe if there was a problem and he said no.  Also after Kelley had learned that she could not count in the staff to child ration and was fired for that reason, Kelley alleges that she contacted Defendants to explain that an injustice had occurred and the Defendants refuse to offer advice or intervene. (¶¶ 27 and 28)

**Conclusion**

For the foregoing reasons, Plaintiff Kelley respectfully requests that the Court not grant Defendant's Motion to Dismiss.

Dated: January 23, 2013                                    Respectfully submitted,

                                                           /s/ Elizabeth Gallie

                                                           Elizabeth Gallie
                                                           Attorney
                                                           Maine Center on Deafness
                                                           68 Bishop Street
                                                           Portland, Maine 04103
                                                           Telephone: 207 797 7656
                                                           Fax: 207 979 9791
                                                           bgallie@mcdmaine.org

**CERTIFICATE OF SERVICE**

I hereby certify that on January 23, 2013, I electronically filed this Defendant's Motion to Dismiss with Incorporated Memorandum of Law with the Clerk of the Court using the CM/ECF system and mailed a copy to the undersigned counsel via electronic at the following address.

Kelly L Turner
Kelly.l.turner@maine.gov

                                                           /s/M Elizabeth Gallie
                                                           M. Elizabeth Gallie

Maine Center on Deafness
68 Bishop Street
Portland, Maine 04133
Tel; (207) 797 7656
Fax: (207) 979 9791
bgallie@mcdmaine.org