## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| ROSEMARY S. KELLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:12-CV-00390-NT |
| | ) | |
| MARY MAYHEW, in her official | ) | |
| capacity as Commissioner, State of | ) | |
| Maine Department of Health and | ) | |
| Human Services and STATE OF | ) | |
| MAINE, DEPARTMENT OF | ) | |
| HEALTH AND HUMAN SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS' MOTION TO DISMISS

This case comes before the Court on the Defendants' motion to dismiss the Complaint for lack of subject-matter jurisdiction and failure to state a claim (ECF No. 4). For the following reasons, the Defendants' motion to dismiss is denied.

## Background

The Plaintiff, Rosemary S. Kelley, alleges the following facts in the Complaint. Since childhood, Kelley has had hearing loss and worn hearing aids. Compl. ¶ 6 (ECF No. 3-2). She had worked as a teacher's assistant at Sonshine Nursery School ("Sonshine") in Friendship, Maine for 31 years until December 23, 2011, when Sonshine ended her employment because Maine's Department of Health and Human Service's ("DHHS") Division of Licensing and Regulatory Services

("DLRS") would not count her towards Sonshine's staff-to-child ratio for purposes of its license to operate a child care facility. Compl. ¶¶ 10, 23-25.

On September 17, 2010, while Kelley was working, DLRS Community Care Worker Brian McAuliffe visited the school to conduct a survey for the school's application for renewal of its license to operate a child care facility. During the visit, McAuliffe became concerned that Kelley was unable to effectively supervise the children because of her hearing loss. Compl. ¶¶ 11-12. McAuliffe had no training or expertise in hearing loss and did not request any information from Kelley about her hearing loss; he at no point asked for a report from her audiologist or asked to review any of her audiograms. Kelley noticed that McAuliffe was observing her that day and asked if anything was wrong. He told her that there was no problem. Compl. ¶¶ 13-16.

McAuliffe told Sonshine's director that he was concerned that Kelley would not be able to hear and respond to the children in an emergency. Compl. ¶ 17. McAuliffe determined that Kelley could not be counted as a staff member for Sonshine's staff-to-child ratio. Compl. ¶ 22. Kelley was one of two staff members supervising a classroom of thirteen children, and if she could not be counted in her class's staff-to-child ratio, Sonshine would need to hire another staff member. Compl. ¶ 21.

On September 21, 2010, DLRS renewed Sonshine's license with the understanding that Sonshine would hire a new employee to comply with the staff-to-child ratio. Compl. ¶ 23. In an October 29, 2010 e-mail to his supervisor,

McAuliffe said: "Unless another staff [member] is available, licensing action will need to be taken on the license, due to the facility not meeting proper staff-child ratios." Compl. ¶ 24.

On November 22, 2010, Sonshine's Chairman of the Board told Kelley that she would be replaced on December 23, 2010, because of the licensing issue. Kelley asked for a chance to get new hearing aids, but the school was too concerned about its license to consider her request. Compl. ¶¶ 25-26.

In December of 2010, Kelley contacted McAuliffe and DLRS several times. In a December 28, 2010 email, Kelley told McAuliffe that she had been wearing hearing aids for the entire 31 years that she worked at Sonshine, that being fired was a nightmare because she loved the children at Sonshine, that she needed new hearing aids, and that she would get them shortly. She told him that she would correct anything she was doing wrong so that she could continue working with children. Compl. ¶ 27. DLRS was unresponsive to Kelley's pleas. Compl. ¶ 28.

Kelley brought a three-count complaint in Kennebec County Superior Court against DHHS and its commissioner, Mary Mayhew, for unlawful discrimination under the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4592(1), (7) (Count I), Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, (Count II), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, (Count III). She seeks a declaratory judgment that the State of Maine's practices are unlawful, injunctive relief ordering the Defendants to promulgate non-discriminatory written policies and procedures, damages, attorney's fees, and costs.

3

The Defendants removed the case to this Court and filed a motion to dismiss the Complaint on the following grounds: (1) the Plaintiff has failed to state a claim upon which relief can be granted under Title II of the ADA, the MHRA, and Section 504 of the Rehabilitation Act; (2) the Eleventh Amendment bars the Plaintiff's Title II claim against the state and Commissioner Mayhew; and (3) the Plaintiff's claims against Commissioner Mayhew in her official capacity are duplicative of the Plaintiff's action against DHHS, so Commissioner Mayhew should be dismissed as a defendant.

## Discussion

## I.   Discrimination Under Title II of the ADA

### A.   Legal Standard

Pursuant to the Supreme Court's opinion in *United States v. Georgia,* 546 U.S. 151, 159 (2006), the Court turns first[1] to whether the Plaintiff has stated a claim for a violation of Title II of the ADA.[2] Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Each allegation must be simple, concise, and direct." Fed R. Civ. P. 8(d)(1). A motion to

---

[1]     The order of operations is important. This Court should avoid the Eleventh Amendment issue if the case can be decided on other grounds. *Buchanan v. Maine,* 469 F.3d 158, 170 (1st Cir. 2006).

[2]     For purposes of the Defendant's 12(b)(6) motion, the parties do not distinguish between the ADA, the Rehabilitation Act, and the MHRA. The sufficiency of the Complaint for the Plaintiff's Title II claim controls her MHRA and Section 504 claims as well. *See Calero-Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 19 (1st Cir. 2004) ("The Rehabilitation Act . . . applies to federal agencies, contractors and recipients of federal financial assistance . . . . [T]he case law construing the ADA generally pertains equally to claims under the Rehabilitation Act."); *Dudley v. Hannaford Bros., Co.,* 333 F.3d 299, 312 (1st Cir. 2003) ("It is settled law that the MHRA should be construed and applied along the same contours as the ADA.").

dismiss for failure to state a claim under Rule 12(b)(6) tests whether a plaintiff has alleged sufficient non-conclusory, non-speculative facts that "plausibly narrate a claim for relief." *Schatz v. Republican State Leadership Comm.,* 669 F.3d 50, 55 (1st Cir. 2013); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). The Court takes the Complaint's well-pled facts as true and draws all reasonable inferences in the plaintiff's favor. *Schatz,* 669 F.3d at 55.

### B. Title II of the ADA

The ADA has five titles, "three of which are meant to eliminate in a distinct area discrimination against persons with disabilities." *Buchanan,* 469 F.3d at 170. Title I deals with discrimination by employers affecting interstate commerce, and Title III governs discrimination in public accommodations and services operated by private entities. *Id*. This case involves Title II of the ADA, 42 U.S.C. §§ 12131-12165, which "addresses discrimination by governmental entities in the operation of public services, programs, and activities, including transportation . . . ." *Id*.

Section 12132 of Title II provides that "no qualified individual with a disability[3] shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity,[4] or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. But Title II

---

[3]     Title II defines "[q]ualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

[4]     Title II defines "public entity" as "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government . . . ." 42 U.S.C. § 12131(1).

"does not require a public entity to permit an individual to participate in or benefit from the services, programs, or activities of that public entity when that individual poses a direct threat to the health or safety of others." 28 C.F.R. § 35.139(a). "The protection afforded by the ADA is characterized as a guarantee of 'meaningful access' to governmental benefits and programs, which broadly means that public entities must take reasonable steps to ensure that individuals with disabilities can take advantage of such public undertakings." *Theriault v. Flynn,* 162 F.3d 46, 48 (1st Cir. 1998) (citations omitted). The First Circuit has explained:

> To prevail on a Title II claim, a plaintiff must demonstrate: "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability."

*Buchanan,* 469 F.3d at 170-71 (quoting *Parker v. Universidad de P.R.,* 225 F.3d 1, 5 (1st Cir. 2000)). To recover compensatory damages under either Title II or Section 504, a plaintiff must demonstrate that the state intentionally discriminated against her and caused her economic harm. *Nieves-Márquez v. P. R.,* 353 F.3d 108, 126 (1st Cir. 2003).

### C. The Plaintiff's Allegations

The Defendants essentially argue that the Plaintiff has not adequately alleged any of the three elements of a Title II claim and that she has not alleged that the state intentionally discriminated against her.

Title II cases comes in many different shapes and sizes, but neither party has cited a case which is on all fours with this one. Although the fit is not perfect, case

law and the federal regulations on disability discrimination in licensing provide the best guidance for analyzing the Plaintiff's claims.

### 1. Qualified Individual with a Disability

According to the First Circuit:

> In the context of licensing or certification, a person is "qualified" and thus within the protected category if he or she can meet the "essential eligibility requirements" for receiving a license or certification, with accommodation made for the disability. In determining whether "essential eligibility requirements" are met, a public entity properly may consider whether an applicant with a disability poses a direct threat to the health and safety of others.

*Theriault,* 162 F.3d at 48 (citations omitted). The Department of Justice regulations provide:

> In determining whether an individual poses a direct threat to the health or safety of others, a public accommodation must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: The nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

28 C.F.R. § 36.208(b) (applicable to Title II per 28 C.F.R. pt. 35 App. A, at 575 (2012).

The Complaint alleges that McAuliffe made a visit to Sonshine where he observed Kelley and became concerned that she was not able to effectively supervise the children and would not be able to hear the children in the event of an emergency. McAuliffe allegedly determined that Kelley could not be counted in the staff-to-child ratio and that DLRS renewed Sonshine's license "with the understanding that any requested corrects would be made by Sonshine within a

reasonable time." Compl. ¶ 23. The Complaint also alleges that McAuliffe stated in an e-mail to his supervisor dated October 29, 2010, that "[u]nless another staff is available, licensing action will need to be taken on the license, due to the facility not meeting proper staff-child ratios." Compl. ¶ 24. The Complaint contains no factual allegations explaining what McAuliffe saw that made him concerned about Kelley and her ability to supervise the children. It does allege that McAuliffe has no training or expertise in hearing loss and that he made no further inquiry into Kelley's condition, either by speaking to Kelley's audiologist (who could have told him more about Kelley's abilities and limitations) or by asking to look at Kelley's audiograms (which would have shown him the extent of Kelley's hearing loss). To the extent that McAuliffe made a determination that Kelley posed a direct threat to the health or safety of the children, it is reasonable to infer from the allegations in the Complaint that McAuliffe's assessment was not based on a reasonable judgment that relied on current medical knowledge or on the best available objective evidence, as required by federal regulations.

Kelley worked as a teaching assistant at Sonshine for thirty-one years and wore hearing aids during her entire tenure. This allows the Court to infer that she was qualified for her position. The Complaint alleges that after Kelley learned that she would not be counted in Sonshine's staff-to-child ratio, Kelley asked both Sonshine and DLRS for an opportunity to get new hearing aids. An individual is qualified if she meets the "essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity"

"with . . . the provision of auxiliary aids." 42 U.S.C. § 12131(2). It is reasonable to infer that improved hearing aids would have corrected any hearing difficulties McAuliffe observed that day. The Complaint alleges sufficient facts to satisfy the first element of the Plaintiff's discrimination claim.

### 2. Exclusion from Participation in or Denial of Public Entity's Benefits, Services, Programs, or Activities or Subjection to Discrimination

The Defendants argue that Kelley cannot make out the second element of her discrimination claim because: (1) she was not the licensee; (2) Sonshine, rather than DLRS, fired Kelley; (3) DLRS was under no duty to accommodate Kelley; and (4) Kelley did not request an accommodation. These arguments are unavailing.

Title II's regulations establish that public entities may not administer licensing programs in "a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(6). The Federal Register explains:

> the public entity may not establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability. For example, the public entity must comply with this requirement when establishing safety standards for the operations of licensees. In that case the public entity must ensure that standards that it promulgates do not discriminate against the employment of qualified individuals with disabilities in an impermissible manner.

Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 Fed. Reg. 35,694, 35,704 (July 26, 1991) (codified at 28 C.F.R. § 35.130(b)(6)). The Plaintiff also cites the Department of Justice's Title II Technical

Assistance Manual, which provides guidance to state and local government to help them apply 28 C.F.R. § 35.130(b)(6). The manual explains that:

> a public entity may not establish requirements for the program or activities of licensees that would result in discrimination against qualified individuals with disabilities. For example, a public entity's safety standards may not require the licensee to discriminate against qualified individuals with disabilities in its employment practices.

Dep't of Justice, Title II Technical Assistance Manual § II-3.7200 (1993); s*ee also* 42 U.S.C. §§ 12134, 12206 (directing the Department of Justice to promulgate regulations to implement Title II and render technical assistance explaining the responsibilities of covered individuals and entities); *Bragdon v. Abbott*, 524 U.S. 624, 642, 646-47 (1998) (holding that "the well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance'" and therefore relying in part on guidance in the Justice Department's Title II Assistance Manual (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944)). It provides the following illustration:

> A State prohibits the licensing of transportation companies that employ individuals with missing limbs as drivers. XYZ company refuses to hire an individual with a missing limb who is "qualified" to perform the essential functions of the job, because he is able to drive safely with hand controls. The State's licensing requirements violate Title II.

Dep't of Justice, Title II Technical Assistance Manual § II-3.7200 (1993).

DLRS first argues that it did not exclude Kelley from a service or program and that its duties extend only to the licensee, not to employees of the licensee. It further argues that it was Sonshine that terminated Kelley and that DLRS did not

take any discriminatory action against her. This line of argument ignores the final phrase of Title II: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, *or be subjected to discrimination by any such entity*." 42 U.S.C. § 12132 (emphasis added). The First Circuit has suggested, albeit in the context of determining whether employment claims are cognizable under Title II of the ADA, that "the words 'public services, programs, or activities' do not necessarily exclude employment, and the 'subjected to discrimination' clause may broaden the scope of coverage further." *Currie v. Group Ins. Comm'n*, 290 F.3d 1, 6-7 (1st Cir. 2002) (footnote omitted).

Based on the allegations in the Complaint, DLRS's decision that Kelley could not be counted in the school's staff-to-child ratio guaranteed her dismissal—and affected her ability to work with children elsewhere. Even though Kelley is not the licensee, according to the allegations in the Complaint, DLRS's administration of its licensing scheme subjected Kelley to discrimination based on her disability, in violation of 28 C.F.R. 35.130(6).

Discrimination can include a public entity's failure to make a reasonable accommodation. 28 C.F.R. § 35.130(b)(7). The Complaint alleges that DLRS's decision was based on McAuliffe's conclusion that Kelley was not able to supervise children effectively because of her hearing loss. The Plaintiff does not use the term "reasonable accommodation" in her Complaint, but she does allege that she contacted McAuliffe multiple times in December of 2010, requesting that she be

given time to purchase new hearing aids.[5]  The ADA does not require the Plaintiff to invoke any specific words to request accommodation. This is not a case where the defendant did not know of the underlying disability or of the Plaintiff's need and desire for new hearing aids.[6] Drawing all reasonable inferences in the Plaintiff's favor, the Court concludes that she has alleged facts sufficient to establish that she asked DLRS for a reasonable accommodation of the licensing requirement—that is, additional time to acquire necessary hearing aids.

### 3. Intentional Discrimination

Finally, the Defendants argue that the Plaintiff may not recover compensatory damages because she has not plead that DLRS intentionally discriminated against her. To recover compensatory damages under either Title II or Section 504, a plaintiff must demonstrate that the state intentionally discriminated against her and caused her economic harm. *Nieves-Márquez,* 353 F.3d at 126.

---

[5]     The Defendants also argue in their reply that Kelley's request for an accommodation, to the extent it was one, was untimely because it came after she was terminated. Because this is not technically an employment discrimination case, it is not appropriate to base Kelley's termination date as a cut-off. Kelley is alleging that DLRS is preventing her from working in any DLRS-licensed day care center. As such, Kelley was not required to request the accommodation before her termination.

[6]     The First Circuit has explained that:

> In cases where the alleged violation involves the denial of a reasonable modification/accommodation, "the ADA's reasonable accommodation requirement usually does not apply unless 'triggered by a request.'" This is because a person's "disability and concomitant need for accommodation are not always known . . . until the [person] requests an accommodation. However, "sometimes the [person]'s need for an accommodation will be obvious; and in such cases, different rules may apply."

*Kiman v. N.H. Dep't of Corrs.,* 451 F.3d 274, 283 (1st Cir. 2006) (footnote omitted) (quoting *Reed v. LePage Bakeries, Inc.,* 244 F.3d 254, 261 & n.7 (1st Cir. 2001)).

The Defendant argues intentional discrimination under Title II is measured under a deliberate indifference standard. For this proposition, the Defendant cites a prisoner case, *Scott v. Androscoggin County Jail,* 866 A.2d 88, 96 (Me. 2004) (deliberate indifference for purposes of Title II requires that "defendant had knowledge that a harm to a federally protected right was substantially likely, and failed to act upon that likelihood"). "The First Circuit has yet to delineate the standard by which intentional discrimination is measured." *Maine Human Rights Comm'n v. Sunbury Primary Care,* 770 F. Supp. 2d 370, 408 (D. Me. 2011). This Court will sidestep the question of the intent required to establish compensatory damages under Title II, because the Plaintiff, by any measure, has alleged enough to defeat a motion to dismiss on this element. *See id.* (not necessary to choose between deliberate indifference and intentional discrimination standards because complaint sufficient under either standard); *McKay v. Winthrop Bd. of Educ.*, No. Civ. 96-131-B, 1997 WL 816505, at *2 (D. Me. June 6, 1997) (same).

The Complaint alleges that McAuliffe was aware of Kelley's hearing loss and that his determination that she could not be included as a staff member in the staff-to-child ratio was based on her disability. The Complaint also alleges that when Kelley finally learned of her impending termination, she repeatedly contacted McAuliffe asking for more time to get hearing aids and her pleas were ignored. Sonshine terminated Kelley and her ongoing eligibility to work in the child care field is in question. From these allegations, the Court can draw the reasonable

13

inference that DLRS intentionally discriminated against the Plaintiff and that she suffered economic harm.

The Plaintiff has set forth claims under Title II of the ADA. As previously stated, the analysis of the claims under Section 504 of the Rehabilitation Act and the MHRA follow the analysis used under Title II. Accordingly, the Defendant's motion to dismiss for failure to state a claim is denied on all counts.

## II.   Eleventh Amendment Immunity

Because the Court finds that the Plaintiff survives the motion to dismiss for failure to state a claim, it must consider the State's argument that it is entitled to Eleventh Amendment immunity on the Title II ADA claim. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The amendment "guarantees that private individuals may not sue nonconsenting states." *Toledo v. Sánchez,* 454 F.3d 24, 31 (1st Cir. 2006). Although the Eleventh Amendment speaks in terms of suits against a State by citizens of another State, the Supreme Court has made clear that "this immunity also applies to unconsented suits brought by a State's own citizens." *Tennessee v. Lane,* 541 U.S. 509, 517 (2004).

"Congress may abrogate the State's Eleventh Amendment immunity." *Id*. To do so, Congress must: (1) unequivocally express its intent to abrogate the state's sovereign immunity; and (2) act pursuant to a valid exercise of its power under § 5

of the Fourteenth Amendment.[7] *Id.* at 517-18. The first requirement is easily met. Congress stated its express intent in § 12202: "A State shall not be immune under the [E]leventh [A]mendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202.

Even though Congress has stated its intent to abrogate state sovereign immunity for all disability discrimination claims brought under the ADA, it has only validly done so for two classes of ADA claims: (1) those alleging discrimination that actually violates the Fourteenth Amendment; and (2) those alleging discrimination that does not violate the Fourteenth Amendment but that Congress may nonetheless prohibit because doing so will prevent and deter unconstitutional discrimination. When considering an Eleventh Amendment immunity claim, the Supreme Court has

> [S]et forth a step-by-step analysis for Title II claims and explained that lower courts should
>
>> determine . . . on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.[8]

---

[7]    "The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5.

[8]    This third step, which deals with assessing legislation which proscribes facially constitutional conduct, is referred to as the *Boerne* analysis because the test was first set forth in *City of Boerne v. P.F. Flores,* 521 U.S. 507, 529-36 (1997).

*Buchanan*, 469 F.3d at 172 (quoting *Georgia,* 546 U.S. at 159).

**A.  Whether State's Conduct Violates Title II**

The Court has already determined that the Plaintiff has stated a claim for an

ADA violation.

**B.  Whether the State's Conduct Violates the Plaintiff's Rights Under the Fourteenth Amendment**

The Plaintiff describes the State's conduct as follows:

> In this case Maine's Division of Regulatory Services, based on her disability, conferred on Kelley an unfavorable status. The unfavorable status was that she could not be counted in the staff to child ratio at the nursery school where she had worked for 31 years. This status cost her her job. Not only was she not told that this unfavorable status had been conferred on her, once she learned of it she was left with no way to appeal the status due to the fact that she was not the licensee.

Pl.'s Opp'n to Defs.' Mot. to Dismiss at 4-5. (ECF No. 6). She then argues:

> Kelley's right was fundamental. She was deprived of her Fourteenth Amendment Due Process Rights. . . . [T]he regulations, policies, and practices of Maine's Division of Regulatory Services resulted in her losing her job and left her without any opportunity to be heard.

*Id.* at 5.  Although she does not elaborate, Plaintiff is fairly asserting that the State

violated her procedural due process rights under the Fourteenth Amendment.[10]

**1.  The Applicable Standards**

In considering a procedural due process claim, the Court must first determine

whether there is a constitutionally protected liberty or property interest at stake.

---

[10]    Although the Plaintiff describes her right as "fundamental," she does not precisely identify the right at issue and does not present a cogent legal theory under a substantive due process analysis.

*See Clukey v. Town of Camden*, 717 F.3d 52, 55 (1st Cir. 2013). As the Supreme

Court has noted:

> "Liberty" and "property" are broad and majestic terms. They are among the "[g]reat [constitutional] concepts . . . purposely left to gather meaning from experience. . . . [T]hey relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged."

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 571 (1972) (quoting *Nat'l Mut.*

*Ins. Co. v. Tidewater Transfer Co.,* 337 U.S. 582, 646 (1949) (Frankfurter, J.,

dissenting)).

The Supreme Court recognized a constitutionally protected liberty interest

for individuals who are stigmatized by the action of government officials in

*Wisconsin v. Constantineau,* 400 U.S. 433, 437 (1971).[11] There, the Court stated:

"Where a person's good name, reputation, honor or integrity is at stake because of

what the government is doing to him, notice and an opportunity to be heard are

essential." *Id*. However, in *Paul v. Davis*, 424 U.S. 693, 701-02 (1976),[12] the

Supreme Court made clear that mere defamation was insufficient to establish a

violation of a constitutionally protected liberty interest. Instead, a litigant must

show stigmatization plus some type of "change in the injured person's status or

rights under substantive state or federal law." *Silva v. Worden,* 130 F.3d 26, 32 (1st

Cir. 1997). This has come to be known as the "stigma plus" standard. *URI Student*

---

[11]     *Constantineau* involved a Wisconsin statute which allowed the police chief to "post" a notice forbidding the sale of liquor to specified individuals. *Constantineau,* 400 U.S. at 434-35. Constantineau suffered that indignity and challenged the constitutionally of the statute. *Id.* Because the statute contained no provision for notice or a hearing, it was struck down as facially unconstitutional. *Id.* at 437-39.

[12]     *Paul* involved a plaintiff whose name and photograph appeared on a flyer captioned "Active Shoplifters." *Paul*, 424 U.S. at 694-96.

*Senate v. Town of Narragansett*, 631 F.3d 1, 9 (1st Cir. 2011). To sustain a claim under this standard, a plaintiff must also show that a government actor "disseminat[ed]" a defamatory charge against her "in a formal setting." *Silva*, 130 F.3d at 32-33.

In *Mead v. Independence Association*, 684 F.3d 226 (1st Cir. 2012), the First Circuit considered two related theories potentially applicable here: that a claimant in a stigma plus case may establish the necessary "plus" by showing either that the government effectively excluded her from a profession by implementing a de facto licensing scheme or that the stigma in question burdened her future employment prospects. *Mead*, 684 F.3d at 233-36.

Mead was the administrator of fifteen assisted-living facilities managed by Independence Association (IA), a private not-for-profit organization licensed by DLRS (coincidentally, the same defendant as in this case). *Id.* at 229-30. After DLRS completed an unannounced survey of Goldeneye Residence, one of the IA facilities administered by Mead, the licensor determined that Mead had failed to take appropriate action against an employee who was abusing prescription medications. *Id.* at 230. DLRS sent IA findings of fact laying out its accusations and an order compelling IA to replace Mead as Goldeneye's administrator. *Id.* Rather than appeal, as Mead urged, IA hired an independent investigator to look into the charges and explore other aspects of Mead's job performance. *Id.* The investigator recommended Mead be let go, based both on DLRS's charges and unrelated problems with Mead's management style, and IA terminated her. *Id.* Mead applied

18

for positions at other assisted care facilities licensed by DLRS, but those employers declined to hire her after learning about DLRS's handling of the Goldeneye affair. *Id.*

Mead put forth three theories as to how the facts of her case established the "plus" part of the stigma plus doctrine: (1) the loss of her job; (2) the burdening of her future employment prospects; and (3) the loss of a de facto occupational license. Considering these theories in light of the facts before it, the First Circuit rejected Mead's claim. *Id.* at 232. The First Circuit first determined that Mead's loss of a job could not be a "plus" in her case, both because DLRS never compelled her firing, even indirectly, and because her job with a private employer "was not a government benefice." *Id.* at 233-34. Though DLRS compelled her replacement as Goldeneye's administrator, it did not compel Mead's termination or her removal from the fourteen other IA assisted-living facilities she administered. *Id.*

Likewise, the First Circuit decided that to the extent that Mead's future employment prospects had "dimmed, the damage is solely the result of harm to her reputation, not some statutory impediment or other legal obstacle to her employment." *Id.* at 235. The *Mead* court pointed to *Valmonte v. Bane*, 18 F.3d 992 (2d Cir. 1994), a Second Circuit case that held that there is a viable "plus" factor where damages flow not merely from a reputational injury and its predictable consequences, but from a concrete legal impediment triggered by the reputational injury. *Valmonte*, 18 F.3d at 1001-02. In *Valmonte*, the state included a child care worker's name on a government registry of child abusers. *Id.* at 994-96. A state

19

statute required potential employers to consult the registry and explain in writing if they decided to hire any individual on the list. *Id.* at 996. The Second Circuit found that the plaintiff satisfied the stigma plus standard. *Id.* at 999-1002.

The *Mead* court also noted that other circuits have reasoned that "a de facto licensing scheme may exist" "when a government body controls entry into a profession through means short of the issuance of a formal license." *Mead*, 684 F.3d at 234. "If we were to follow these circuits," the *Mead* court continued, "there might be some force to Mead's argument that a de facto license is a government benefice" and "the revocation of a de facto license . . . might be a valid 'plus' insofar as it 'effects a change in the injured person's status or rights under substantive state or federal law.'" *Id. (*quoting *Silva,* 130 F.3d at 32*).* The First Circuit sidestepped the question because DLRS barred Mead only from administering Goldeneye but took no action to prevent her from working at any other facility run by IA or its competitors. *Id.* at 235.

While *Mead* is a liberty interest case, the case law suggests the line between liberty interests and property interests is, at best, a fuzzy one, and it is possible that a property interest analysis could apply in de facto licensing cases. For instance, in *Mertik v. Blalock*, 983 F.2d 1353 (6th Cir. 1993), a case *Mead* relies on, the Sixth Circuit found both a liberty interest and a property interest in a skating instructor's privileges to hold teaching sessions at a public ice rink. *Mertik*, 983 F.2d at 1359-64. In *Phillips v. Vandygriff*, 711 F.2d 1217 (5th Cir. 1983), another case *Mead* relies on, the Fifth Circuit analyzed a de facto licensing scheme under a

liberty interest rubric, but also commented that "the difference between formal licensing and de facto licensing [is] unimportant." *Phillips*, 711 F.2d at 1223. Since formal licensing is typically analyzed as a property interest, it might make sense to analyze de facto licensing the same way.[18] Likewise, if "a de facto license is a government benefice" similar to a "government job," as *Mead* suggests, it stands to reason that revoking a de facto license implicates a constitutionally protected property interest. *Mead*, 684 F.3d at 234. Under such an analysis, the "stigma" element would likely fall away, and the focus would instead be on whether the plaintiff had a "legitimate claim of entitlement" to the de facto license in question. *See Clukey*, 717 F.3d at 55.

Generally, an individual has a "legitimate claim of entitlement" in a benefit where the decision to grant or deny it is limited by "'specific conditions'" provided for under "'substantive state or federal law,'" but not "'if government officials may grant or deny it in their discretion.'" *Id.* at 56 (quoting, respectively, *Colburn v. Trs. of Ind. Univ.*, 973 F.2d 281, 589 (7th Cir. 1992), *Beitzell v. Jeffrey*, 643 F.2d 870, 874 (1st Cir. 1981), and *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 776 (2005)); *see also Perry v. Sindermann*, 408 U.S. 593, 599-604 (1972) (de facto tenured state employee had a constitutionally protected property interest in his job, as his supervisor could decide not to re-hire him only after reaching a finding that his

---

[18]     *See, e.g., Barry v. Barchi*, 443 U.S. 55 (1979) (license to train harness-racing horses); *Beauchamp v. De Abadia*, 779 F.2d 773, 775 (1st Cir. 1985) (license to practice medicine); *González-Droz v. González-Colón*, 660 F.3d 1, 13 (license to practice cosmetic surgery); *Guillemard-Ginorio v. Contreras Gomez*, 161 Fed. Appx. 24, 28 (1st Cir. 2005) (license to sell insurance); *Amsden v. Moran*, 904 F.2d 748, 752 (1st Cir. 1990) (strongly suggesting that property interest existed in license to survey land).

work fell below a standard provided for by substantive state law); *Roth*, 408 U.S. at 576-578 (at-will state employee did not have a constitutionally protected property interest in his job as his supervisor could decide not to re-hire him for any reason). The source of "substantive state or federal law" which bounds the discretion of the government may be a statute, a regulation, an employment contract, or even a common understanding that can be traced back to government action. *See Barry*, 443 U.S. at 38-60, 64; *Perry*, 408 U.S. at 602.

Once a constitutionally protected property or liberty interest is identified, the Court must then determine how much process is due before the government may lawfully deprive an individual of that interest. Regardless of whether the interest is identified as a liberty or a property interest, due process, at a minimum, requires notice and an opportunity to be heard. *Clukey*, 717 F.3d at 59 (property interest); *Constantineau*, 400 U.S. at 436-37 (liberty interest).

### 2.    Application of the Law to the Facts Alleged

The Defendants contend that because Kelley was an at-will employee working for a private entity, she cannot have a constitutionally protected property interest in her job. That may be true, but it is also beside the point. Fairly considered, the Plaintiff's argument is not that she has a constitutionally protected property interest in her job, but rather that she has a constitutionally protected interest in her status as an individual who will "count" when DLRS calculates the staff-to-child ratios of the child care centers it licenses. The Plaintiff's allegation that DLRS "conferred . . . an unfavorable status" on her without due process

amounts to a claim that DLRS unlawfully deprived her of a constitutionally protected liberty interest in her job-related reputation and that that deprivation worked a change in her legal rights. Accordingly, we apply the stigma plus standard laid out in *Mead* to her claim.

As for the stigma portion of the test, the Court infers that McAuliffe was applying DLRS regulations when he made the determination that Kelley could not "count" toward the staff-to-child ratio. The Complaint alleges that "the relevant regulations" regarding DLRS's determination of staff-to-child ratios "do not require that child care staff be able to hear," but rather "require staff to provide safe and compassionate services" and "state that each child shall be supervised by a staff member who is aware of and responsible for the ongoing activity of each child and who is near enough to the child to intervene when needed." Compl. ¶ 19. Drawing all reasonable inferences in the Plaintiff's favor, DLRS's conclusion that the Plaintiff could not "count" amounted to a factual finding that the Plaintiff is incapable of providing children "safe and compassionate services" and of remaining "aware of and responsible for the ongoing activity" of the children in her care. This is essentially a determination that she is incompetent at her job, despite 31 years of service to Sonshine. While less inflammatory than the accusations in some of the stigma plus cases—for instance, no one accuses the Plaintiff of *abusing* children, as in *Valmonte*, 18 F.3d at 1001-02—DLRS's finding amounts to legally cognizable stigmatization. *See, e.g., Roth*, 408 U.S. at 573 (suggesting that a constitutionally protected interest is implicated where "the State . . . impose[s] . . . a stigma or other

disability that foreclose[s] [an individual's] freedom to take advantage of other employment opportunities"); *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 630-31 (6th Cir. 1996) (explaining that "governmental allegations of professional incompetence" implicate a constitutionally protected liberty interest "when they denigrate the employee's competence as a professional . . . in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession"). Further, DLRS both disseminated this determination (it told the Plaintiff's employer and would presumably tell any other child care center that tried to hire her) and did so in a relatively formal setting (in the course of conducting its formal facility-by-facility licensing process).

Kelley has also alleged facts which satisfy the "plus" factor under either the de facto licensing theory or the "tangible burdens on future employment prospects" theory discussed in *Mead*. Though the First Circuit has not yet formally adopted either theory, both describe situations which effect "a change in [an] injured person's status or rights under substantive state or federal law" and therefore satisfy the "plus" factor inquiry. See *Silva*, 130 F.3d at 32-33.

Regarding the de facto license theory, when the Plaintiff lost her status as a person who "counts" under DLRS regulations, she became effectively unemployable in her chosen profession. *Id.* Maine child care facilities are not multinational corporations. The Court can infer that Sonshine and other DLRS-licensed child care facilities cannot afford to carry additional staff and that an individual determined

not to "count" in DLRS's staff-to-child ratios is effectively locked out of the field.[24]
Accordingly, unlike *Mead*, the facts here do allege that "a government body controls
entry into a profession through means short of the issuance of a formal license."[25]
*Mead*, 684 F.3d at 234.

The analysis is much the same under the "tangible burdens on future
employment prospects" theory. DLRS's determination that the Plaintiff cannot
"count" would presumably apply if she attempted to find employment with another
child care center licensed by DLRS. Accordingly, another child care center would
face the same government-compelled choice Sonshine did: risk losing its license, pay
two people for the same work, or pass on employing the Plaintiff altogether. This is
just the sort of legal obstacle required to make out the "plus" factor under the
"tangible burdens on future employment prospects" theory. *See Mead*, 684 F.3d at
236. Unlike in *Mead*, the harm flows not merely from a reputational injury, but
from a concrete legal impediment triggered by a government-imposed stigma.

Accordingly, based on the facts alleged in her Complaint, the Plaintiff has
identified a constitutionally protected interest.

### 3. The Process Due

---

[24]    In this sense, the Plaintiff's case is similar to *Greene v. McElroy*, 360 U.S. 474, 492 (1959),
where the Supreme Court suggested that an aeronautical engineer likely had a constitutionally
protected interest in a security clearance necessary for his job with a private contractor, without
which "'he [was] effectively barred from pursuit of many aspects of his profession . . . .'" *Id.* at 491
n.21 (quoting *Greene v. McElroy*, 254 F.2d 944, 952 (D.C. Cir. 1958)).

[25]    If a de facto license can be analyzed as a property interest, the question would be merely
whether the plaintiff had a legitimate claim of entitlement to the de facto license. The Plaintiff likely
would be able to make this showing. The licensing rules promulgated by DLRS clearly constitute
substantive state law. Additionally, they appear to provide definite criteria which limits DLRS's
discretion: only individuals not capable of "provid[ing] safe and compassionate services" or "being
aware of and responsible for the ongoing activity of" twelve children can be stripped of their status as
individuals who "count."

The final issue, then, is how much process the Plaintiff was due and whether or not she was afforded that process. Here, the inquiry is straightforward. Under the facts alleged, DLRS gave the Plaintiff no process whatsoever—it never notified her that her status was under review, never gave her a chance to make her case, and never told her that it had made a decision. Because DLRS has so far failed to respond to the Plaintiff's requests for accommodation or even acknowledged that it engaged in an individualized assessment of her qualifications, the Plaintiff could not appeal the decision, and her ability to work at a child care facility in Maine remains under a cloud.[26] Since "the Constitution requires, at a minimum, some kind of notice and some kind of opportunity to be heard," the Plaintiff's allegations make out a violation of her procedural due process rights under the Fourteenth Amendment. *Clukey*, 717 F.3d at 59 (property interests); *see also Constantineau*, 400 U.S. at 436-37 (reputational liberty interests).

---

[26]     The Defendants assert that the Plaintiff has failed to "allege any facts that suggest a continuing violation of federal law" and her claim for injunctive relief is therefore moot. Defs' Reply at 2 (ECF No. 7). The Defendants' argument, which is not supported with any meaningful discussion of the case law on mootness, is unavailing. In *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 116 (1974) the Supreme Court explained that a case remains justiciable where a "challenged government activity is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties." *McCorkle*, 416 U.S. at 122 (employer's suit for a declaratory judgment that state regulations permitting striking workers to receive public assistance violated the Supremacy Clause was not moot even though strike had ended, because the issue could substantially affect future labor negotiations between the parties); *see also ConnAire, Inc. v. Sec'y, U.S. Dep't of Transp.*, 887 F.2d 723 (6th Cir. 1989) (commercial airline's appeal of decision to suspend its operating certificate for 120 days not moot even though airline had served entire suspension, because suspension could affect its future relationship with the agency); *Allende v. Shultz*, 624 F. Supp. 1063, 1064-66 (D. Ma. 1985) (Chilean political figure's suit for a declaratory judgment that the government's denial of her application for a travel visa in 1983 was unlawful was not moot even though the government granted the political figure a travel visa in 1985, because the government might deny the political figure a visa in the future on the same grounds). Given that the Plaintiff's ability to "count" in DLRS's staff-to-child ratio calculations remains in doubt and given that DLRS has so far failed to respond to her pleas for reconsideration, this is such a case.

26

There is one important caveat. The Eleventh Amendment analysis is based on the Court's determination that the Complaint, with all inferences made in the Plaintiff's favor, alleges conduct by the State which violated Plaintiff's Fourteenth Amendment rights. Should, after discovery, the facts establish that the State's conduct was different than alleged, it is possible that the State's conduct did not violate the Plaintiff's Fourteenth Amendment rights. This may be what the First Circuit was intimating in *Buchanan* when it noted:

> It may be difficult in some instances to determine on motions under Rule 12(b)(6) whether plaintiff's complaint stated a viable Title II claim. That is so because of both the generous notice pleading rules in federal practice and the rule that no greater pleading requirements are imposed on civil rights plaintiffs. As a result, there may need to be further specificity about the precise nature of the plaintiff's claims and some discovery after the suit begins. Title II may be constitutional at least for claims "against the States for conduct that *actually* violates the Fourteenth Amendment." This again demands some greater specificity as to the alleged Title II claims.

*Buchanan*, 469 F.3d at 172 n.8 (citations omitted) (quoting *Georgia,* 546 U.S. at 159).

## B.  Has Congress Abrogated Sovereign Immunity Under the *Boerne* Analysis

Because the Court concludes that the State's conduct, as alleged, violated the Fourteenth Amendment, it need not at this time address the question of whether Title II constitutes "prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Nev. Dep't of Human Res. v. Hibbs,* 538 U.S. 721, 727-28 (2003).[27] Nor does the Court need to

---

[27]  The First Circuit described the test under *Boerne*, 521 U.S. at 529-36, as follows:

address the Plaintiff's argument that the *Ex Parte Young* doctrine applies to avoid an Eleventh Amendment bar to suit.[28] Because the nature of the Court's ruling may depend on how the Plaintiff's claims evolve over the course of discovery, the Court will allow the Plaintiff to proceed, but will allow the State to reassert its Eleventh Amendment immunity claim should the facts warrant.

## Conclusion

The Defendants' Motion to Dismiss for failure to state a claim is **DENIED.** The Defendant's Motion to Dismiss Count Two for lack of jurisdiction and Defendant's Motion to Dismiss claims against Defendant Mayhew as a duplicative

---

To determine whether prophylactic legislation under § 5 is valid, a court must consider: (1) the constitutional right or rights that Congress sought to protect when it enacted the statute; (2) whether there was a history of constitutional violations to support Congress's determination that prophylactic legislation was necessary; and (3) whether the statute is a congruent and proportional response to the history and pattern of constitutional violations.

*Toledo,* 454 F.3d at 34-35 (citing *Lane,* 541 U.S. at 522-31). *Compare Guttman v. Khalsa,* 669 F.3d 1101 (10th Cir. 2012) (no abrogation of sovereign immunity under Title II in licensing context) *with Lamberson Reynolds v. Pennsylvania,* No. 3:09cv1492, 2010 WL 2572798 (M.D. Pa. June 21, 2010) (valid abrogation of sovereign immunity under Title II in the licensing context).

[28]    *Ex Parte Young,* 209 U.S. 123 (1908) (Eleventh Amendment does not bar suits by individuals against state officers for declaratory or injunctive relief); *Idaho v. Coeur d'Alene Tribe,* 521 U.S. 261, 289 (1997) (federal court has jurisdiction over a suit against a state officer to enjoin official actions that violate federal law where a plaintiff seeks prospective relief to end a state officer's ongoing violation of federal law) (O'Connor, J., concurring in part and concurring in judgment); *see also Bd. Of Trs. Of Univ. of Ala. v. Garrett,* 531 U.S. 356, 473 n.9.

Defendant are **DENIED** without prejudice to the Defendants' right to reassert these claims at a later point in the proceedings.

SO ORDERED.

Dated this 23rd day of September, 2013.

/s/ Nancy Torresen
United States District Judge